UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| LAINE CRAIG SHORE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:03-cv-341 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| JOHN E. POTTER, | ) | |
| | ) | **OPINION** |
| Defendant. | ) | |
| _____ | ) | |

This is an employment discrimination action brought by a former letter carrier against the Postmaster General of the United States. Plaintiff filed a *pro se* complaint on May 20, 2003 asserting unlawful discrimination on the basis of religion and sex. (docket # 1, ¶ 9). Plaintiff later retained counsel, who filed a nine-count first amended complaint asserting the following claims:

1. Reverse sex discrimination based on a "discipline/rebuke" related to plaintiff's use of a cell phone and inefficient mail-handling practices during an October 1998 route inspection;

2. Reverse sex discrimination when plaintiff was "disciplined/rebuked" in December 1998 for threatening co-worker Jon Falk;

3. Reverse sex discrimination in July 1999, when plaintiff was "disciplined/rebuked" for improper handling of bulk mail and for his failure to obtain permission prior to leaving the post office;

4. Retaliation against plaintiff based on the "discipline/rebuke" for mishandling of bulk mail and for unexcused absence;

5. Reverse sex discrimination based on a "discipline/rebuke" plaintiff received for failure to follow instructions on February 29, 2000;

6.      Retaliation against plaintiff in the form of a "discipline/rebuke" for plaintiff's failure to follow instructions followed by an order requiring plaintiff to undergo a fitness for duty examination after plaintiff's physician had indicated that plaintiff required a psychological examination "ASAP";

7.      Reverse sex discrimination in the termination of employment;

8.      Age discrimination in the termination of employment; and

9.      Retaliation in the termination of employment.

(First Amended Complaint, docket # 9).  Plaintiff seeks monetary damages, injunctive relief, plus attorney's fees, costs, and statutory interest.

Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties voluntarily consented to have a United States Magistrate Judge conduct all further proceedings in this case, including entry of final judgment.  (docket # 19).  On December 22, 2004, defendant filed the motion for summary judgment[1] now before the court.  (docket # 61).  After briefing had been completed, the court conducted a lengthy hearing on defendant's motion for summary judgment.  During the February 25, 2005, hearing, plaintiff's counsel withdrew all plaintiff's Title VII reverse sex discrimination claims (counts 1, 2, 3, 5, 7) because discovery had shown that such claims could not be factually supported.  Plaintiff's attorney withdrew all plaintiff's claims of unlawful retaliation in violation of  Title VII, with the exception of plaintiff's claim of retaliatory discharge (count 9).  The only other claims not abandoned by counsel are found in count 8, in which plaintiff claims that termination of his employment constituted unlawful age

---

[1] Defendant has clarified that despite the label "ex parte" appearing on some exhibits, all exhibits submitted in support of defendant's motion were served upon plaintiff's counsel.  (docket # 70).

discrimination and retaliation in violation of the Age Discrimination in Employment Act (ADEA). For the reasons set forth herein, defendant's motion for summary judgment will be granted.

## <u>Applicable Standards</u>

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 431 (6th Cir. 2004); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Terry v. LaGrois*, 354 F.3d 527, 530 (6th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see Rainer v. Union Carbide Corp.*, 402 F.3d 608, 614 (6th Cir. 2005); *Martingale LLC v. Louisville*, 361 F.3d 297, 301 (6th Cir.), *cert. denied*, 125 S. Ct. 453 (2004).

The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005). The party moving for summary judgment bears the initial burden of pointing out to the district court that there is an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000);

*see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005).  Once defendant shows that "there is an absence of evidence to support the nonmoving party's case," plaintiff has the burden of coming forward with evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004); *Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792 (6th Cir. 2004).  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'"  *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 252).  "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations.  Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment.  The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may believe factually uncontested proof."  *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004)(citations omitted).

## Facts

The following facts are beyond genuine issue.  Plaintiff is a former employee of the United States Postal Service at the Cadillac, Michigan post office.  Plaintiff was a city letter carrier assigned to Cadillac's city route # 2.[2]

---

[2] Although plaintiff has abandoned most of the claims appearing in his first amended complaint, facts related to plaintiff's abandoned claims provide context for plaintiff's remaining claims.

1.      <u>October 5, 1998 Route Inspection</u>

Jacqueline Bourgard was postmaster of the Cadillac post office in October 1998. Michael "Mick" Houghton was plaintiff's immediate supervisor.  As a temporary supervisor of customer service, also known as a 204B supervisor, Mr. Houghton supervised the city carriers, like plaintiff, and the clerk craft employees. (Houghton Dep., 5; Koboldt Dep., 6).  Prior to October 5, 1998, plaintiff had expressed concern that his delivery route was overburdened.  Plaintiff found it difficult to complete his route within the designated eight-hour time frame.  Supervisor Houghton agreed undertake a route inspection.  The route inspection involved Houghton's accompanying plaintiff on the delivery route and attempting to assess the route's demands, particularly whether it could reasonably be completed within the time allotted.  (Houghton Dep., 10-11; Plf. Dep., 10, 17-18; Bourgard Dep., 44-47).  Part of Houghton's his job in conducting a route inspection was eliminating "time wasting practices."  (Houghton Dep., 58-59).

On October 5, 1998, the route inspection began inside the Cadillac post office. During this office portion of the inspection, Supervisor Houghton observed plaintiff "casing" his mail. Houghton found that plaintiff was not performing this task in the proper manner.  Plaintiff was inefficiently "taking one flat at a time out of the tub."  (Houghton Dep., 58).  Houghton instructed plaintiff on a more efficient method of accomplishing the task of "casing" his mail.  (*Id.*).  Houghton did not take any disciplinary action against plaintiff for improperly casing his mail. Houghton simply instructed plaintiff on how casing should be performed.  (*Id.*).

Mr. Houghton accompanied plaintiff on the physical delivery portion of the route. It is undisputed that plaintiff received multiple personal phone calls during the course of the route inspection.  (Plf. Dep., 13; Houghton Dep., 12).  After plaintiff had received approximately three

phone calls, Houghton concluded that plaintiff's cell phone use had reached a point sufficient to constitute a time wasting practice. Houghton directed plaintiff to return his cell phone to his vehicle, and thereafter plaintiff and Houghton would continue walking along plaintiff's usual mail delivery route. Houghton did not discipline plaintiff in any way for plaintiff's conduct during the route inspection. Houghton eventually terminated the route inspection, having determined that it was not serving any useful purpose. (Houghton Dep., 12-13, 58).

        Upon returning to the Cadillac post office, Houghton complained to Postmaster Bourgard that plaintiff would not listen to his direction regarding cell phone use. Ms. Bourgard called plaintiff into her office and attempted to explain to plaintiff the logic of why he could not use a cell phone while a route inspection was being conducted. Plaintiff became argumentative. Bourgard advised plaintiff that he could not use his cell phone. Plaintiff and Houghon left the room. Plaintiff was not punished or reprimanded in any way for his actions. (Bougrad Dep., 51-56).

        On October 9, 1998, plaintiff filed grievances concerning cell phone use and Houghton's criticism of plaintiff's casing method. The casing grievance was denied. The cell phone grievance was initially denied, but after Postmaster Bourgard learned that plaintiff's father had been very ill on the date of the route inspection, she had the grievance recalled to her at step 2. (Bourgard Dep., 56, 106-07).[3] On November 20, 1998, plaintiff filed a formal EEO complaint stating that he was a "white male" and was claiming reverse sex discrimination on the basis of the casing criticism and cell phone incidents. (Attachment to Schmidt Decl.; Attachment to Grundner Decl. at 1). On December 9, 1998, the parties entered into settlement agreements. Both settlement agreements

---

        [3]Step 1 grievance review is conducted by the employee's supervisor. Step 2 is conducted by the local postmaster or her designee. Step 3 grievance hearings are conducted in Grand Rapids, Lansing, or Chicago. (Bourgard Dep., 27-28).

concluded as follows: "The above constitutes a full and complete settlement of the subject case and resolves any and all issues pertaining thereto." (12/9/1998 Settlement Agreements, Attachments to Hughes Decl.; *see* Plf. Dep., 155-56). This incident did not result in any discipline, reprimand or other employment consequence.

2.    December 1998 Threat By Plaintiff Reported by Co-Worker Jon Falk

On December 29, 1998, Jon Falk was a postal service employee at the Cadillac post office. He was employed as a city letter carrier. On that date, plaintiff made a statement to Mr. Falk to the effect that Falk had better leave the Cadillac post office, and that if Falk stayed he was "going to wish [he] hadn't." (Jon Falk Decl., ¶¶ 1-5 & attachments). Mr. Falk perceived plaintiff's statement as a threat. Falk reported plaintiff's threat in writing to his supervisor, Mr. Houghton. Falk was required to report the incident pursuant to the United States Postal Services' Threat Assessment Guide. (Plf. Dep., 29; Bourgard Decl., 4; Houghton Dep., 66-68). Paragraph 1 of the Threat Assessment Team Guide states, "An employee who has been the victim of a threat or an assault will immediately report the situation to any manager or supervisor. The manager or supervisor to whom the incident is reported will immediately report the matter to the Postal Inspection Service. This reporting requirement must be adhered to without exception for all incidents involving threats and assaults." (docket # 62. Ex. 1). Paragraph 1-1 of defendant's Workplace Violence Prevention program states that the program depends on a universal zero tolerance policy statement and a consistently implemented zero tolerance action plan. (*Id.*). As required by these postal policies, Mr. Houghton notified the Postal Inspection Service. (Bourgard Decl., ¶ 4). The next day, December 30, 1999, Postmaster Bourgard met with plaintiff, Mr. Falk, and their supervisor, Mr. Houghton. After discussing the matter with all parties, Ms. Bourgard

-7-

determined that it was not necessary for the Postal Inspection Service to proceed any further.  On December 30, 1998, Ms. Bourgard sent a letter to the Postal Inspection Service advising that she had conducted an investigation, met with the parties involved, and that the incident simply appeared to have been a case of one carrier (plaintiff) "pestering" another (Falk).  (Bourgard Decl., ¶ 5 & 12/30/1998 letter attached).  On December 31, 1998, plaintiff filed a grievance objecting that notice had been provided to the Postal Inspection Service.  The grievance was resolved roughly a month later on January 29, 1999.  The parties agreed that no acts of discrimination had occurred.  Mr. Falk had filed an unsolicited, formal, written complaint alleging that plaintiff had made a threat against him.  Post office management had no discretion.  They had to report the incident to the Postal Inspection Service under postal policy.  Other instances where postal employees had been involved in arguments on the workroom floor which had not been reported to the Postal Inspection Service were different in kind.  Such incidents "did not involve a formal (or any) complaint of a threat by one employee toward another." (1/29/1999 Ruling, Hughes Decl. attachment; *see* Plf. Dep., 156-57).  Plaintiff suffered no disciplinary action or other consequence arising from his threat against Jon Falk. (Plf. Dep., 37).

      3.     <u>July 1999 Incidents Involving Mail that Accumulated While Plaintiff Had Been on Vacation and Leaving the Postal Premises Without Permission</u>

      On July 13, 1999, plaintiff returned to work following a vacation.  He found some bulk mail that had not been delivered while he had been absent.  (Plf. Dep., 43-44).  Mr. Houghton testified that he had not seen this mail because it had been pushed to the back of the case and was obstructed from view.  (Houghton Dep., 46).  Houghton acknowledged that it was probably his fault that this happened.  It was Houghton's job to make sure that the bulk mail did not accumulate in this

fashion. (Houghton Dep., 46-47). Plaintiff delivered this mail on the day he returned from vacation without incident. (Plf. Dep., 54, 56).

On July 15, 1999, plaintiff left the premises of the Cadillac post office without permission. (Plf. Dep., 56). Plaintiff admits that he never requested or received permission to leave the postal premises. (Plf. Dep., 57). Plaintiff should have been taking an on-premises break, casing his mail, or attending a fire safety service talk. (Bourgard Dep., 83). When plaintiff returned to the Cadillac post office, the fire safety meeting was already under way, (Plf. Dep., 57; Houghton Dep., 22-27), and approaching its conclusion. (Bougrad Dep., 83).

Plaintiff is a city carrier, and the contractual duties of city carriers are distinct from the duties of rural carriers.[4] "[A] city carrier is mandated by time allotments where a rural carrier isn't, so a rural carrier can go off premises. A city carrier cannot." (Bourgard Dep., 82). Plaintiff was not able to identify any female city carriers who had left the postal premises without permission. (Plf. Dep., 63).

On July 21, 1999, Houghton issued plaintiff a Letter of Warning, which notified plaintiff of a proposed suspension for the seven day period from August 14, 1999 to August 21, 1999, for failure to follow instructions. The charge described the incident in these terms:

> On July 15, 1999 at approximately 9:15 A.M. we were having fire safety training and you could not be found. When you returned I asked where you had been and you said on my break what difference does it make where I take it. On P.S. Form 1564A your break is reflected as A.M. in the office. Another employee told me that you had left the office and went to the bank.

---

[4]Postal Service employees at the Cadillac post office are represented by three different unions. The National Association of Letter Carriers ("NALC") represents letter carriers like plaintiff. The NRLC represents the rural letter carriers. The APWU represents the clerk craft employees. These three unions have negotiated different contracts on behalf of their members. (Bourgard Dep., 28-29; Warner Decl., ¶ 4-9 & attachment).

When given an opportunity to explain your actions you said that you had to get an account straightened out.

(docket # 62, Ex. 2). The Letter of Warning advised plaintiff that he was entitled to appeal through the grievance procedure. (*Id.*). Plaintiff filed a grievance. The matter was resolved by a settlement agreement dated September 22, 1999, which states, in pertinent part, as follows:

> RELEVANT FACTS: Management issued a 7 Day Suspension Letter to Letter Carrier L. Craig Shore for "Failure to Follow Instructions". The grievant had been informed and discipline issued on a previous occasion for deviating from assigned break location. In this particular instance the grievant left the building and postal premises (without permission) at a time that is designated as an office break on PS1564A.
>
> CONTRACTUAL VIOLATION: Violation is in direct conflict with the Employee and Labor Relations Manual, Section 666.1, Discharge of Duties and Section 666.51 Obeying Supervisor's instructions. Additionally, the M-41 states in Section 1, Item 16 – "Carriers may expect to be supervised at all times while in the performance of their daily duties". It should be noted that leaving the building without permission would remove the employee from direct supervision.
>
> DECISION: While Management contends that according to the National Agreement all action was within the scope of the National Agreement it can also understand that lacking a formal policy on leaving the premises it could be considered a "gray" area. Therefore, in good faith, Management agrees to withdraw the seven day suspension. Further, Management will inform all personnel during the next Safety/Service Talk as to local policy regarding leaving Postal Premises during work hours.
>
> The above constitutes a full and complete settlement of the subject case and resolves any and all issues pertaining thereto.

(Attachment, Hughes Decl.; Plf. Ex. 6; *see* Plf. Dep., 157-58). Plaintiff was not subjected to any disciplinary action. The proposed seven-day suspension was rescinded. (Houghton Dep., 27, 60-61; Plf. Dep., 145).

On October 21, 1999, one month after entering into the above-quoted settlement agreement, plaintiff filed an EEO complaint asserting discrimination in the form of "retaliation." Plaintiff's complaint stated as follows: "SCS Houghton withheld bulk mailing from delivery for

about 10 days so complainant would have to deliver them on return from vacation on 7/13/99.  On 7-29-1999 SCS Houghton gave plaintiff notice of a 7 day suspension for running brief errand off USPS property while on morning break.  Many other USPS employees have briefly left PO property for personal reasons."  (Attachment, Schmidt Decl.).  Plaintiff has not identified any similarly situated postal employee who left the premises without permission who received more favorable treatment.

      4.     <u>December 1999 Incidents Involving Mail Security</u>

      By the fall of 1999, Mr. Houghton had left the Cadillac post office.  Shortly thereafter, Michael Huff became a 204B supervisor in Cadillac.  Mr. Huff had never met with plaintiff.  Huff knew nothing about plaintiff's work history.  Mr. Huff is older than plaintiff.[5]  Huff served as one of the Cadillac post office's temporary 204B supervisors during a period from November 1999 until approximately April 2000.  (Huff. Decl., ¶¶ 2-3).  On December 12, 1999, Huff gave plaintiff a direct order not to leave mail unsecured.  On that date, plaintiff did not lock his delivery vehicle while on his route, thereby leaving mail unsecured inside his vehicle in violation of postal policy.  (Huff Decl., ¶ 8).  On December 30, 1999, Ms. Cheryl Koboldt, another 204B supervisor, informed Mr. Huff that a complaint had been received regarding plaintiff's leaving undelivered mail on a customer's exterior porch.  The practice of leaving mail on someone's porch is known as a "porch drop" or "porch relay."  A letter carrier who engages in this prohibited practice leaves a bundle of undelivered mail in plain view in an unsecured location, while the carrier continues on his route.  In this way, the carrier does not have to carry as much mail while completing

---

      [5] It is undisputed that both Houghton and Bourgard were also older than plaintiff.  (Plf. Dep., 9; Bourgard Dep., 4).

a delivery loop and can avoid a return trip to his vehicle to retrieve additional mail.  (Plf. Dep., 64-65).  Plaintiff had previously been instructed that porch drops constituted an improper practice.  (Huff Decl., ¶ 9; Plf. Dep., 68).  Plaintiff stated that it did not bother him that the mail was just sitting there on the porch where anybody could come and get it.  (Plf. Dep., 66).  Use of porch drops is against Postal Service policy, because mail must be secured at all times.  (Huff Decl., ¶ 9).  Mr. Huff and Ms. Koboldt traveled to 208 Stimson Street, a residence on plaintiff's route.  They located first and third-class mail sitting on an unsecured, open porch.  This location was well outside plaintiff's field of view.  Plaintiff was "a block or so away" delivering other mail on South Park Street.  Huff and Koboldt took possession of the unsecured mail and returned it to the Cadillac post office.  When plaintiff returned to the office, he inquired as to the location of the mail he had left unsecured on the porch.  (Huff Decl., ¶¶ 10, 11; Plf. Dep., 69, 76-77; Koboldt Dep., 21-24; Bourgard Dep., 88-98).

On January 17, 2000, Mr. Huff issued a proposed seven day suspension of plaintiff for plaintiff's failure to secure the mail.  (Attachment, Huff Decl.; Plf. Ex. 12).  Plaintiff had received numerous warnings regarding his failure to secure the mail, the most recent occurring in mid-December 1999.  Mr. Huff did not issue this proposed discipline based upon any consideration of plaintiff's sex or age.  At the time Huff issued the proposed discipline, Huff had no knowledge that plaintiff had filed any prior EEO complaints against the Postal Service.  (Huff Decl., ¶¶ 11, 12).  Plaintiff never suffered any actual disciplinary sanction for his failure to keep the mail secure.  (Plf. Dep., 145).

5.    February 29, 2000 Incidents Involving Plaintiff's Removal of Mail Without Proper Verification and Review of Union Files on Route Time

On February 29, 2000, Mr. Huff issued notice of proposed fourteen-day suspension against plaintiff for failure to follow instructions. During the time plaintiff was punched in on the time clock as being on route time, plaintiff was reviewing his union files. Postal policy allows employees to work on union materials at certain points in their workday. However, postal policy requires the employee to switch from route time to union time on the clock. This allows postal management to accurately track the actual time that the letter carrier needs to complete his or her route by making sure that the letter carrier is not working on other tasks during route time. Accurate recording of delivery time was particularly important during this time period because the Cadillac post office was in the midst of a study to determine whether its routes were too long. Mr. Huff instructed plaintiff that if he was going to review his union files he needed to switch from route time to union time. Plaintiff indicated that he would not follow Huff's order. (Huff. Decl., ¶¶ 13-15).

The notice of proposed suspension was also based on plaintiff's failure to obtain a supervisor's signature on personal mail before taking it from the post office. On February 29, 2000, Mr. Huff saw that plaintiff appeared ready to leave the premises with his own personal mail. Plaintiff's practice was to have his mail held at the Cadillac post office and take it home with him at the end of the day rather than having it delivered to his residence. (Plf. Dep., 78). In February 2000, Postmaster Bourgard had made it clear that employees were not to remove their personal mail from the post office without first having a supervisor verify that the mail in question was in fact the employee's own personal mail and sign each piece of mail. When Supervisor Huff saw plaintiff getting ready to leave on February 29, 2000, Huff reminded plaintiff that he should not leave the premises without first having Huff sign or initial the mail. Plaintiff did not do so. Instead, plaintiff

-13-

defied Huff's authority by turning and walking away from Huff, leaving the building without having Huff review his mail.  Ultimately, Huff had to run out into the parking lot, catch plaintiff, and verify that the mail plaintiff had taken was indeed plaintiff's personal mail.  (Huff Decl., ¶ 15, Plf. Dep., 81-84).

On March 17, 2000, Mr. Huff proposed a fourteen-day suspension based upon plaintiff's failure to follow his instructions regarding obtaining a supervisor's signature on personal mail before leaving the building and with respect to plaintiff's failure to follow the instruction to switch from route time to union time on the time clock.  (Attachment, Huff Decl.).  Huff did not issue the proposed fourteen-day suspension based on plaintiff's age, sex, or in retaliation for any prior EEO activity.  Mr. Huff was not aware of any prior EEO activity.  Huff first learned of plaintiff's EEO activity in approximately October of 2000 when he was contacted by an EEO investigator to make a statement.  Huff had left employment at the Cadillac post office in April 2000.  (Huff. Decl., ¶¶ 16-18).  Plaintiff was never subjected to the proposed disciplinary sanction.  (Plf. Dep., 145).

6. <u>Plaintiff's Failure to Deliver Time-Sensitive Fliers in Late February and Early March, 2000</u>

On February 29, 2000, the Cadillac post office received fliers from K-Mart and JoAnn Fabrics indicating that the last date for delivery of the fliers was March 1, 2000.  (docket # 62, Ex. 3).  Plaintiff curtailed[6] the fliers on February 29, 2000, rather than delivering them.  On March 1, 2000, Supervisor Koboldt left a note on plaintiff's case indicating that the fliers had to be delivered

---

[6]"Curtailing" is the term utilized to describe a practice of not delivering items of bulk mail until a later date because the carrier lacked sufficient time to deliver the all the mail for his route on a particular date.  (Houghton Dep., 44-45).

that day.  Koboldt testified that she had also verbally emphasized to plaintiff that the fliers required immediate delivery.  It is undisputed that plaintiff failed to deliver the fliers by the expiration of the deadline.  (Plf. Dep., 89; Koboldt Dep., 77-84).  At approximately 2:20 p.m. on March 1, 2000, Koboldt checked to see if plaintiff had taken the fliers out with him for delivery.  Koboldt discovered that the fliers were still in the office.  Koboldt considered plaintiff's actions to be a clear delay of the mail.  (docket # 62, Ex. 4; Koboldt Dep., 18).  Supervisor Koboldt proposed that plaintiff receive disciplinary action for his delaying of delivery of the mail.  (Koboldt Dep., 87).  A notice of proposed removal was filed for his failure to follow instructions and deliver K-Mart and Jo-Ann fliers.  (Plf. Dep., 89; Koboldt Dep., 92; Bourgard Decl., ¶ 7).  Plaintiff admits that he did not deliver these fliers. (Plf. Dep., 89).  Plaintiff did not receive the proposed disciplinary sanctions.  (Plf. Dep., 145).

       7.    <u>Fitness for Duty Examination</u>

       On March 7, 2000, plaintiff called the Cadillac post office and left a message indicating that he required immediate emergency annual leave.  (Koboldt Dep., 30, 59-60).  Plaintiff indicated that he needed this leave based on a non-work related "assault" and a work-related hernia. (Koboldt Dep., 33, 36).  Plaintiff was advised that because he was claiming a work-related injury, he needed to pick up and complete certain postal service forms before seeing a doctor.  Plaintiff responded that he would wait and see what the doctor said.  On March 7, 2000, plaintiff went to see Dr. Zeiter without the postal service forms.  (Koboldt Dep., 61).  When plaintiff arrived at Dr. Zeiter's office, his primary complaint was of left groin pain, which he attributed to carrying some heavy bags at work.  (Zeiter Decl., ¶ 4 & attachments).   In the process of obtaining plaintiff's history, plaintiff advised Dr. Zeiter that he was experiencing mental or emotional problems.  Dr.

Zeiter prescribed an anti-depressant and attempted to schedule an appointment for plaintiff to see a psychologist.  (Zeiter Decl., ¶ 5 & attachments).

On March 8, 2000, Ms. Koboldt went to Dr. Zeiter's office to have the postal service paperwork completed.  (Koboldt Dep., 63).  At Dr. Zeiter's office, Ms. Koboldt gave the forms to Cindy Buege, Dr. Zeiter's occupational health nurse.  Nurse Buege took the forms back to Dr. Zeiter and then she returned with the completed forms.  (Koboldt Dep., 64).  Dr. Zeiter wrote that plaintiff should remain "off work" for an "unknown" duration on the basis of depression.  Dr. Zeiter recommended that plaintiff undergo a psychiatric evaluation "ASAP."  (Plf. Dep., 109,  113, 117, 177-79; Plf. Exhibits 10, 11; Koboldt Dep., 64; Zeiter Decl., ¶ 5 & attachments, docket # 62, Ex. 5).  Nurse Buege may have related to Koboldt something to the effect that Dr. Zieter was concerned that plaintiff might "go postal," but Dr. Zeiter subsequently indicated that he would not have described plaintiff's condition utilizing that particular phrase.  (Koboldt Dep., 65, docket # 62, Exs. 4, 5).

Ms. Koboldt contacted Postmaster Bourgard and asked what should be done. Postmaster Bourgard advised that Ms. Koboldt should contact Nate Allen, a specialist in workmen's compensation, because plaintiff was claiming a work-related injury.  Mr. Allen subsequently referred Koboldt to Suzanne Surrell, Occupational Health Nurse Administrator in Grand Rapids, Michigan. Grand Rapids-based labor relations specialist Doug Warner was also in contact with Mr. Allen and Surrell regarding this situation.  On the basis of Dr. Zieter's recommendation of a psychological examination "ASAP," Nurse Surrell ordered that plaintiff undergo a fitness for duty examination.[7] (Plf. Dep., 117-18; Plf. Ex. 10; docket # 62, Ex. 6; Koboldt Dep., 65-67; Bourgard Dep., 63-73;

---

[7] Plaintiff had previously been ordered to undergo a fitness for duty examination in July of 1998.  Plaintiff's co-workers apparently perceived plaintiff as a threat to their safety.  The results of this examination found no basis for imposing work restrictions.  (Nurnberger Dep., 83-85).

Bourgard Decl., ¶ 8; Surrell Decl., ¶¶ 1-5 & attachment).  Postmaster Bourgard ordered plaintiff on paid temporary administrative leave.  (Plf. Dep., 110; Koboldt Dep., 55; Bourgard Dep., 74; Warner Decl., ¶ 9).  Plaintiff remained on paid administrative leave for the period from March 22, 2000 until plaintiff returned to his regular duties on April 27, 2000.  (Attachments, Skibinski Decl.).

On April 24, 2000, William Decker, M.D.,  a board certified forensic psychiatrist and neurologist, conducted plaintiff's fitness-for-duty examination.   Dr. Decker concluded in his subsequent report that plaintiff had a rigid, inflexible, maladaptive personality and was indifferent to the criticisms of others.  This personality structure caused disharmony with co-workers and made plaintiff highly resistant to change.  Dr. Decker indicated that if plaintiff's employment were terminated, there was a likelihood that plaintiff would lash out impulsively in a physical and harmful way against those he felt had offended him.  Dr. Decker was also concerned that plaintiff might physically injure himself to the point of suicide.  (Bourgard Decl., ¶ 9 & attachment; Decker Decl., ¶¶ 1-6 & attachments).  On June 8, 2000, Postmaster Bourgard received a letter from Dr. James Smiggen, Contract District Medical officer for the United States Postal Service, advising Postmaster Bourgard of Dr. Decker's findings.

On June 9, 2000, plaintiff's union representative contacted Bourgard and requested that the parties meet to discuss whether anything could be done to avoid plaintiff's termination as proposed on March 31, 2000, but not yet made official.  In light of reported damage that plaintiff might cause to himself and/or others if terminated, Postmaster Bourgard decided that the best course of action was to make an attempt to resolve the outstanding disciplinary actions against plaintiff. (Bourgard Decl., ¶ 10; Warner Decl., ¶ 7).  On June 9, 2000, Bourgard, plaintiff, and plaintiff's union representative all signed a "Mutual Agreement" wherein the United States Postal Service

-17-

agreed that it would hold in abeyance for one year specific pending disciplinary actions against plaintiff.  If at the conclusion of the year plaintiff remained disciplinary action free, all the listed disciplinary actions would be purged from plaintiff's personnel file.  Plaintiff's then-pending grievances were withdrawn.  The parties agreed that plaintiff would be placed on temporary sick leave effective June 9, 2000, for a period of two weeks, and that plaintiff would return to work on June 24, 2000.  This time would allow plaintiff a sufficient opportunity to arrange counseling sessions.  The agreement further provided that the United States Postal Service would extend plaintiff's "EAP sessions to include an additional 12 sessions and at the end of those 12 weeks if additional counseling [was] recommended, it [would] remain Mr. Shore's responsibility to continue counseling through his personal health insurance."  Plaintiff agreed that he would sign a release of information allowing counselors to advise the Postal Service whether plaintiff had attended the scheduled sessions.  (Attachment, Hughes Decl.; Bourgard Decl., ¶¶ 10-11).

On or about June 9, 2000, plaintiff filed a formal EEO complaint of discrimination claiming reverse sex discrimination and retaliation.  Plaintiff's complaint did not identify any dates when alleged acts of discrimination had occurred.  (Attachment, Schmidt Declaration).  "On file with original EEO," is the only entry appearing in paragraph 13 where plaintiff was to explain the specific actions or situation that resulted in alleged discrimination.  (Attachment, Schmidt Decl.).

8.     Delivery Point Sequence Mail Incident Leading to the Termination of Plaintiff's Employment

Delivery point sequence (DPS) mail is mail that arrives at local post offices already placed in order for delivery.  DPS mail is already cased in order and placed in a tray in the order of delivery.  (Burton Harrison Dep., 5).  Before implementation of the DPS program, city carriers

received all the mail for their route, sorted through it, and arrange it street-by-street. This was unnecessary with DPS mail, because the mail arrived already arranged in order. (Nurnberger Dep., 98-98). DPS mail was not to be cased by carriers. (Harrison Dep., 21-23; Numberger Dep., 98).

       Lori Holmes became a 204B supervisor in Cadillac on April 1, 2000. Ms. Holmes had no prior involvement in any disciplinary action taken against plaintiff. On September 25, 2000, plaintiff left his case area and went out and retrieved his DPS mail from the post office's dock. (Plf. Dep., 123-24). Plaintiff admits that Holmes had previously instructed him not to do this. (Plf. Dep., 134-36). Postmaster Bourgard had likewise advised plaintiff that he was not to case his DPS mail. (Bourgard Dep., 73). On September 25, 2000, Ms. Holmes observed plaintiff carrying a flat tub out to the dock. She observed plaintiff pull out a tray of DPS mail and dump it into a tub. (docket # 62, Ex. 8). Paragraph 4 of the Supervisor's Just Cause Fact Sheet,[8] set forth verbatim below, describes the incident which eventually resulted in the termination of plaintiff's employment:

> On 9-25-00 at approximately 9:30 a.m. I was counting RR 11 mail and noticed city carrier C. Shore carrying a flat tub out to the dock. I walked out behind him and observed him pull a tray of DPS out of the bread rack and dump it into a tub. I walked back to the office and a couple of minutes later I saw Craig [plaintiff] go over to the parcel case. I walked over and he had a flat tub stuffed on top of another. I asked him what was in the bottom tub and he stated hold mail as he was dumping spr's in the top tub. I lifted the top tub and about 2-300 letters were in the bottom tub. I stated at this point that I had observed him on the dock dumping the tray of DPS. He stated what was I doing on the dock anyway, I should be on the floor counting mail. I told him he should have been in his case and not on the dock and he knew he wasn't suppose to touch the DPS. He said he was pulling out the DPS holdouts. I went over to his case and noticed mail in sequence order and he stated it was his 999 mail. At the time I ask Craig and Mike Houseman to meet me in a private

---

[8] During all time periods relevant to this lawsuit, it was the practice of various branch postal offices, including Cadillac, to provide Just Cause Fact Sheets to the Labor Relations Department of the Postal Service when proposing employee discipline. A Labor Relations Specialist would review the proposed discipline to ensure that appropriate consideration had been given to the progressive disciplinary process set forth in the postal service's collective bargaining agreement with the NALC. (Warner Decl., ¶¶ 1-9 & attachments).

office.  I repeated to Craig what he had done and it was a failure to follow instructions and ask him why.  He stated it was his hold out mail from DPS at the front of his tray.  Then I ask M. Houseman if he knew the DPS procedure and he stated its not to be touched until you leave for the route.  I told Craig at this point that discipline would follow.  On 2 previous occasions I have found C. Shore on the dock or attempting to case in his DPS and told him to return to his case or that he wasn't to case DPS mail.  (RE: Supv. Notes DTD 7-1-00 and 6-3-00).

      I walked over to see Mr. Shores letter mail on his case and he again told me it was 999 mail and he had taken all the DPS back out to the bread cart.  At this point I went to the dock with the postmaster and we observed the DPS it looked short of the END of the RUN Report.  I asked E. Sharp at this point to count the trays of mail.  She counted 328 pcs.  In one tray and 398 pcs. In the other tray.  For a total of 726 pcs. Of mail.  The End of Run report for C002 was 1137 pcs.  A shortage of the 411 pcs of mail that I had observed being dumped into the flat tub.

(docket # 62, Ex. 8).  Ms. Holmes drafted a Notice of Proposed Removal which plaintiff received on October 10, 2000.  (docket # 62, Ex. 9).  The notice advised plaintiff that Martin Slabbekoorn, Post Office Operations Manager in Grand Rapids, Michigan, would be making the United States Postal Service's determination whether plaintiff's employment would be terminated.  Plaintiff did not respond to the charges set forth in the Notice or Proposed Removal.  He elected not to take advantage of his opportunity to respond in writing or at a personal meeting with Mr. Slabbekoorn.  Plaintiff's attorney apparently did file a letter dated November, 2000, for Slabbekoorn's consideration.  On November 9, 2000, Operations Manager Slabbekoorn issued his Letter of Decision advising plaintiff that he found the charges against plaintiff were fully supported by the evidence, and warranted plaintiff's removal.  Slabbekoorn determined, "You have repeatedly failed to follow the instructions of your managers and you show no signs that you ever will."  Slabbekoorn's Letter of Decision advised plaintiff that his removal would be effective November 18, 2000.  (Ex. 10; Plf. Dep., 139).

      Plaintiff filed a grievance regarding his termination.  Plaintiff pursued his available remedies all the way through an arbitration. On April 6, 2001, the arbitrator issued an order and

lengthy supporting opinion finding that the United States Postal Service had shown just cause for the disciplinary action of terminating plaintiff's employment.  (Plf. Dep., 140-46; Attachments, Bitely Decl.).

On February 21, 2001, plaintiff filed an EEO complaint.  Plaintiff identified the dates of discrimination as April 1998 through November 2000.  Plaintiff claimed discrimination on the basis of religion ("Christian") sex ("male/terminate"), age ("44 with 24 years of civil service"), and retaliation ("removal" without identifying the prior EEO activity on which the retaliation claim was based).  Plaintiff identified the basis for this claim of discrimination as follows: "J. Bourgard showed favoritism by selecting C. Koboldt as 204B in Nov. 99.  Koboldt followed directions of Bourgard by harassing me on route and false allegation in Dec. 99.  Both Huff/Koboldt lied about incident as to reason of street supervision.  Holmes in retaliation for 4-J-493012299 [against Houghton], signed with Bourgard a notice of removal in Nov. 2000.  Proof that EEO activity gets you removed." (Attachment, Schmidt Decl).

As required by contract, plaintiff's city carrier job position was held open until after the arbitrator had rendered a decision finding "just cause" for terminating plaintiff's employment. After the arbitrator's decision, the vacant city carrier position was posted.  According to postal policy, any full-time city letter carrier in Cadillac was eligible to bid on and receive plaintiff's former job.  If any of the eight full time carriers had wanted plaintiff's former position it would have been theirs for the taking.  (Plf. Dep., 154; Harrison Dep., 30).  None of these carriers bid on the position. (Plf. Dep., 153; Bourgard Decl., ¶¶ 13-15).  Brandon Barth, then the most senior part-time flexible city carrier in the Cadillac post-office, accepted the position by bidding for it in April of 2001. (Bourgard Decl., ¶ 15 & attachments).

On September 30, 2002, Administrative Law Judge Deborah Barno issued a twenty-seven page opinion finding no evidence that plaintiff had been discriminated against on the basis of sex, religion, age, or in retaliation for his prior EEO activity. (Attachment, Grundner Decl.). On April 23, 2003, the EEOC accepted plaintiff's appeal from the agency's final order. The EEOC affirmed the agency's order. The EEOC issued a right-to-sue letter on April 23, 2003. Plaintiff filed his original complaint on May 20, 2003, asserting reverse sex and religious discrimination. (docket # 1 & attachment), followed by his nine-count first amended complaint (docket # 9), later reduced at oral argument to two remaining counts challenging plaintiff's termination from employment: count 8, age discrimination and retaliation in violation of the ADEA; and count 9, unlawful retaliation for plaintiff's prior EEO activity in violation of Title VII.[9]

---

[9]Defendant would have nonetheless been entitled to judgment in its favor as a matter of law on counts 1-7 in the absence of plaintiff's abandonment of those claims. There is no direct evidence of any form of intentional discrimination in this case. The majority of plaintiff's claims were Title VII claims of reverse sex discrimination. Plaintiff utterly failed to satisfy his *prima facie* case burden, among other things having failed to present evidence that defendant is that unusual employer discriminating against men in favor of women, the absence of materially adverse employment actions, and lack of evidence that any similarly situated women were treated more favorably. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004); *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *see also Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Plaintiff did not present evidence indicating that the defendant's legitimate, non-discriminatory reasons for taking the actions described were a pretext for discrimination. Plaintiff's retaliation claims were similarly devoid of the requisite evidentiary support. The abandoned claims are also barred on the basis of settlement agreements. *See Lockhart v. United States*, 961 F. Supp. 1260, 1266-67 (N.D. Ind. 1997) (postal service employee's Title VII claim precluded by settlement agreement achieved through the grievance process); *see also Anderson v. Frank*, 755 F. Supp. 187, 189 (E.D. Mich. 1991); *accord Morris v. Alcan Foil Prod.*, No. 95-5673, 1996 WL 614353, at * 2 (6th Cir. Oct. 23, 1996); *Bowman v. Henderson*, 1:99-cv-795 (W.D. Mich. 2000) (copy attached as Ex. 11, docket # 62).

<u>Discussion</u>

I.      **ADEA Claims**

The Age Discrimination in Employment Act ("ADEA") generally prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions or privileges of employment because of the individual's age."  29 U.S.C. § 623(a).  The prohibition against age discrimination by the postal service in its personal decisions is codified at 29 U.S.C. § 633.  *See DeCarlo v. Potter*, 358 F.3d 408, 414 n.14 (6th Cir. 2004); *see also Podobnik v. United States Postal Serv.*, No. 04-3059, 2005 WL 1059248, at * 3 (3d Cir. May 5, 2005).  Cases under the ADEA are analyzed under the same analytical framework as employment discrimination cases under Title VII.  *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *see also Bolander v. BP Oil Co.,* No. 03-4176, 2005 WL 332426, at * 3 (6th Cir. Feb. 10, 2005).   As with other employment discrimination claims, an age discrimination claim can be shown by direct  evidence or indirectly through the *McDonnell Douglas* burden shifting analysis.  *See Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 547 (6th Cir. 2004); *see also Schuch v. Savair, Inc.*, No. 03-1834, 2004 WL 2649713, at * 3 (6th Cir. Nov. 19, 2004); *Charles v. Postmaster General*, No. 03-5927, 2004 WL 950178, at * 1 (6th Cir. Apr. 28, 2004).  Plaintiff has not presented any direct evidence of age-based discrimination. A *prima facie* case[10] of age discrimination under a disparate treatment theory consists of four elements: (1) the plaintiff was forty years old or older at the time of the alleged discrimination; (2) that he was subjected to a materially adverse employment action; (3) that he was qualified for the position; and (4) that he was replaced by a substantially younger person or

---

[10] "The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the court."  *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003), *cert. denied*, 124 S. Ct. 2392 (2004).

that similarly situated non-protected employees were treated more favorably. *See Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510-11 (6th Cir. 2004); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 377 (6th Cir. 2002); *see also McElroy v. Philips Medical Sys. N. Am., Inc.*, Nos. 03-6219, 03-6351, 2005 WL 406335, at * 5 (6th Cir. Feb. 18, 2005). It is undisputed that plaintiff was qualified to be a city letter carrier. Employment termination is a materially adverse employment action. Plaintiff was forty-two years old as of the date of the alleged discrimination and plaintiff was eventually replaced by Mr. Barth, a man in his twenties. Defendant necessarily concedes that plaintiff "arguably state[s] a *prima facie* case of age discrimination in the termination of his employment." (Def. Brief at 34, docket # 62).

Under the *McDonnell Douglas* burden shifting framework, once the plaintiff establishes a *prima facie* case of intentional discrimination, the burden shifts to the defendant to articulate a nondiscriminatory reason for its action. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The defendant's legitimate non-discriminatory reason for the termination of plaintiff's employment was plaintiff's repeated failure to follow instructions from his supervisors. The burden then shifts back to plaintiff to demonstrate that the defendant's proffered reason for his termination was a pretext for unlawful age discrimination. The Sixth Circuit has recognized three primary routes to proving pretext: the plaintiff must show (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate his discharge; or (3) that the reasons given were insufficient to motivate discharge. *Weigel*, 302 F.3d at 378; *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Plaintiff's failures to follow instructions are well-documented. The proffered reason for plaintiff's termination

-24-

has an exceptionally strong factual basis. *See, e.g., Skvarla v. Potter*, No. 04-1027, 2004 WL 1873211, at * (7th Cir. Aug. 13, 2004) (No *prima facie* case of age discrimination because plaintiff disobeyed direct orders, repeatedly behaved in a disruptive and confrontational manner, and failed to demonstrate that similarly situated employees engaged in comparable conduct.). Plaintiff has not presented evidence showing that the reasons Mr. Slabbekoorn gave for terminating plaintiff's employment with the postal service did not actually motivate plaintiff's discharge, or that the reasons given by Mr. Slabbekoorn were insufficient to support plaintiff's discharge. Although not dispositive, it is nonetheless worthwhile to note that the arbitrator found that plaintiff's actions constituted "just cause" for employment termination under the collective bargaining agreement. Plaintiff has not overcome defendant's legitimate, non-discriminatory reason for terminating his employment, *Rowan*, 360 F.3d at 547; *Schuch*, 2004 WL 2649713, at * 6, and has not carried his burden of showing that defendant's termination was a pretext for age discrimination.

Plaintiff also espouses a claim of age discrimination based upon a "hostile work environment" theory. This claim fails for many of the reasons previously discussed. A *prima facie* case of age discrimination based upon a hostile work environment theory requires plaintiff to prove the following: (1) that he was 40 years or older as of the date of the alleged discriminatory act; (2) that the employee was subjected to harassment, either through words or actions, based on age; (3) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) a basis for imposing liability upon the employer. *See Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-36 (6th Cir. 1996). Plaintiff has presented no evidence that the "harassment" of which he complains was in any way based upon his age. Plaintiff has not presented evidence showing a work

environment that was objectively intimidating and hostile on the basis of age.  An atmosphere involving "a simple clash of personalities" does not suffice.  *Id.* at 836; *accord Virgilio v. Potter*, No. 01-2004, 2003 WL 682746, at * 3 (6th Cir. Feb. 24, 2003).  Plaintiff has not shown that his work performance was impeded by a work environment pervasively hostile to older workers.  *Id.* Defendant is entitled to summary judgment on this hostile work environment claim as a matter of law.

Plaintiff contends that the termination of his employment constituted unlawful retaliation in violation of the ADEA.  The ADEA states, "It shall be unlawful for an employer to discriminate against any of his employees because such individual, member or applicant for membership has opposed any practice made unlawful by this section . . . ."  29 U.S.C. § 623(d). Plaintiff has not presented any direct evidence of retaliation.  In order to establish a *prima facie case* of retaliation in violation of the ADEA, plaintiff must show that (1) he engaged in activity protected under the ADEA; (2) plaintiff's exercise of protected activity was known to the employer; (3) the employer thereafter took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action.  *See Weigel*, 302 F.3d at 381; *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990); *see also McElroy*, 2005 WL 406335, at * 8; *Graves v. Fleetguard, Inc.*, No. 98-5893, 1999 WL 993963, at * 4 (6th Cir. Oct. 21, 1999).  There is no question that plaintiff satisfied the adverse employment action component, but plaintiff falls short on all other components of his *prima facie* case.  The evidence before the court is that plaintiff did not engage in activity protected under the ADEA before the postal service's termination of his employment.  Plaintiff filed his first EEO claim asserting age discrimination <u>after</u> his termination.  Plaintiff was required to produce evidence that his protected

expression under the ADEA was "a 'substantial' or 'motivating' factor in the defendant's decision to terminate employment." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996). This requirement necessitates a "showing of causality between the protected activity and the adverse employment decision" and mere speculation does not suffice. *Hile v. Pepsi-Cola Gen. Bottlers, Inc.*, No. 95-4361, 1997 WL 112404, at \*7 (6th Cir. Mar. 12, 1997). "Federal standards are clear that temporal proximity standing alone is insufficient to establish a causal connection for a retaliation claim." *McElroy*, 2005 WL 406335, at \* 10 (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001) and *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). Plaintiff's employer could not have known of a protected activity under the ADEA that had not yet occurred. Plaintiff has not submitted evidence sufficient to support a *prima facie* case of ADEA retaliation. Even assuming that plaintiff had presented a *prima facie* case, defendant has presented a legitimate nondiscriminatory reason for plaintiff's termination and plaintiff has not presented evidence indicating that defendant's reasons were pretextual. *See Dama v. Target Corp.*, No. 04-1569, 2005 WL 1027496, at \* 1 (6th Cir. May 3, 2005). In summary, defendant is entitled to judgment as a matter of law on all plaintiff's ADEA-based claims.

## II.      Title VII Claim

Plaintiff's only remaining claim is that the termination of his employment constituted unlawful retaliation in violation of Title VII. Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. Section 717(a) of Title VII, 42 U.S.C. § 2000e-16(a) prohibits discrimination on "based on race, color, religion, sex, or national origin" in United States Postal Service personnel actions. Title VII prohibits discrimination against an employee because that employee has opposed any

practice made an unlawful practice by Title VII.  42 U.S.C. § 2000e-3(a); *see Atkins v. Runyon*, No. 97-56322, 1998 WL 452089, at * 1 (9th Cir. July 20, 1998); *Brown v. Runyon*, No. 96-2230, 1998 WL 85414, at * 2 n.5 (4th Cir. Feb. 27, 1998).  The analytical framework applicable to a Title VII retaliation claim is quite similar to that of an ADEA claim.  As previously noted, claims of intentional discrimination may be established either by proffering direct evidence of discrimination, or by relying on circumstantial evidence to create an inference of discrimination.  *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  Plaintiff has proffered no direct evidence of discrimination.  Accordingly, plaintiff is required to establish a  *prima facie* case of discrimination under the familiar framework established and refined by the Supreme Court in *McDonnell Douglas*, *Burdin*, and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993).

In order to find a *prima facie* case of retaliation under Title VII, a plaintiff must prove by a preponderance of the evidence that:  (1) plaintiff engaged in activity protected by Title VII; (2) plaintiff's exercise of his civil rights was known by the defendant; (3) thereafter, the defendant took an employment action adverse to plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Nguyen v. City of Cleveland*, 229 F.3d at 563; *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  Plaintiff has shown that he participated in the EEO process:  (1) when he filed a complaint in 1998 asserting reverse sex discrimination based on Supervisor Houghton's criticism of plaintiff's method of casing and telephone use during the October 15, 1998 route inspection; (2) when plaintiff complained about undelivered mail and a proposed seven-day suspension by Mr. Houghton in October 1999; and (3) when plaintiff claimed reverse sex discrimination and retaliation in June 2000, without alleging specific actions or dates, but presumably based upon the proposed disciplinary action by Supervisor

Koboldt for plaintiff's failure to deliver the time-sensitive fliers and/or the fitness for duty examination ordered by the occupational health nurse. There is no evidence that Ms. Holmes, the individual who proposed plaintiff's termination for failure to follow instructions, was aware of plaintiff's protected EEO activities. There is no evidence that Mr. Slabbekoorn had knowledge of any of plaintiff's EEO activities. Although the *prima facie* case burden is not onerous, plaintiff was required to come forward with some evidence in this regard, and he has failed to do so.

        Furthermore, in order to establish the causal connection required in the fourth prong, plaintiff was required to produce sufficient evidence from which an inference could reasonably be drawn that the adverse action would not have been taken but for the plaintiff's protected activity. *See Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *see also Steiner v. Henderson*, No. 03-4195, 2005 WL 221530, at * 3-5 (6th Cir. Jan. 31, 2005). Although no one factor is dispositive, the Sixth Circuit has identified "evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights" as relevant factors. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). "The mere fact that an adverse employment decision occurs after protected activity has taken place is not, standing alone, sufficient to support a finding that the adverse employment action was in retaliation for the protected activity." *Askew v. United States Dep't of the Army*, No. 96-1877, 1997 WL 681522, at * 2 (6th Cir. Oct. 30, 1997); *see Wolfe v. Norfolk S. Ry. Co.*, No. 01-5239, 2003 WL 2007936, at * 2 (6th Cir. Apr. 29, 2003). *Post hoc ergo propter hoc* is not a rule of legal causation. *See Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990); *see also Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). Plaintiff has not submitted sufficient evidence to support the causation component of his *prima facie*

case.  Plaintiff has not presented any evidence of any other similarly situated employee with a similar misconduct record who was not terminated by the postal service.  The postal service was not obligated in any way to have entered into the June 9, 2000 agreement to expunge from plaintiff's record various misconducts if plaintiff could reform his behavior and remain misconduct-free for a year.  It is noteworthy that plaintiff's prior EEO complaints were against different supervisors. Supervisor Holmes was not aware of plaintiff's prior EEO complaints.  The Notice of Proposed Removal expressly advised plaintiff that Mr. Martin Slabbekoorn, Post Office Operations Manager in Grand Rapids, Michigan, would make the decision whether to terminate plaintiff's employment. (docket # 62, Ex. 9 at 2).  Plaintiff has not presented any evidence that Mr. Slabbekoorn had any knowledge of plaintiff's EEO activity, much less evidence that such activity was the likely cause of Slabbekoorn's decision to terminate plaintiff's employment.[11]

Assuming *arguendo* that plaintiff had been able to present a *prima facie* case, defendant would nonetheless be entitled to judgment in its favor.  Defendant articulated a legitimate, non-discriminatory reason for plaintiff's termination.  *McDonnell Douglas v. Green*, 411 U.S. at 802-03; *see also Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 275-76 (6th Cir.), *cert. denied*, 540 U.S. 813 (2003); *Diehl v. Tele-Solutions, Inc.*, 57 F.3d 482, 483 (6th Cir. 1995).  Defendant having met its burden, the burden shifted to plaintiff to show that the defendant's articulated reason was a pretext for discrimination.  *See Allen v. Michigan Dep't of Corrections*, 165 F.3d at 409; *see also Johnson v. O'Neill*, No. 04-3550, 2005 WL 1027554, at * 6 (6th Cir. May 3, 2005).  Plaintiff has not presented evidence from which defendant's reason for terminating plaintiff's employment could be

---

[11] Mr. Slabbekoorn is never mentioned in plaintiff's brief in opposition to defendant's motion for summary judgment.

considered a pretext for retaliation in violation of Title VIII.  *See McDonell Douglas*, 411 U.S. at 802-03; *Allen*, 165 F.3d at 409.

## **Conclusion**

For the reasons set forth herein, defendant's motion for summary judgment (docket # 61) will be granted and judgment entered in defendant's favor on all plaintiff's claims.


Dated:  May 11, 2005                    /s/  Joseph G. Scoville_____
                                         United States Magistrate Judge